# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SAMUEL N.,[1] | : | |
| *Plaintiff*, | : | CIVIL ACTION |
| v. | : | No. 22-3621 |
| | : | |
| MARTIN O'MALLEY[2], | : | |
| Commissioner of Social Security, | : | |
| *Defendant*. | : | |

### MEMORANDUM

JOSÉ RAÚL ARTEAGA                                          September 30, 2024
United States Magistrate Judge

The Commissioner of Social Security, through an Administrative Law Judge ("ALJ"), determined that Plaintiff Samuel N. became disabled on his 55th birthday, but was not disabled before then. Samuel N. seeks remand, arguing that his disability onset date was earlier. He contends the ALJ failed to properly evaluate medical source opinions, violated agency regulations, made determinations that were not based on substantial evidence, and failed to develop the record. He also maintains that the ALJ and Appeals Council Judges were not properly appointed and lacked authority to adjudicate

---

[1] Samuel N. is referred to solely by his first name and last initial in accordance with this Court's standing order addressing party identification in social security cases. See Standing Order, In re: Party Identification in Social Security Cases (E.D. Pa. June 10, 2024), https://www.paed.uscourts.gov/sites/paed/files/documents/locrules/standord/SO_pty-id-ss.pdf (last visited Sept. 16, 2024).

[2] Martin O'Malley became Commissioner of Social Security on December 20, 2023, and he is substituted as the Defendant in this matter pursuant to Federal Rule of Civil Procedure 25(d).

his claim. After careful review of the record, Samuel N.'s request for review is DENIED and the Commissioner's decision is AFFIRMED.

## I.    BACKGROUND

Samuel N. filed his application for Supplemental Security Income on September 13, 2018, alleging disability beginning on December 12, 2017 based on depression, anxiety, a learning disability, illiteracy, memory loss, kidney issues, high cholesterol, lung issues, obesity, diabetes, and psoriasis. (Tr. 270-79, 314-25.). He did not appear for an October 3, 2019 hearing before ALJ Jennifer M. Lash where the Agency's Vocational Expert Maria De Leon-Curet testified. His attorney was present and did not object to taking De Leon-Curet's testimony in his client's absence. (Tr. 61-69.) Samuel N. eventually testified at a November 16, 2020 supplemental hearing with a Spanish interpreter present. (Tr. 38-60.) On September 24, 2021, the ALJ determined that Samuel N. became disabled on his 55th birthday—August 13, 2021—but was not disabled before then: a partially favorable determination. (*See* Tr. 12-30.) The Appeals Council denied his request for review. (Tr. 1-8.) This appeal followed.

More specifically, the ALJ found that Samuel N. has had "the residual functional capacity to perform medium work" since December 12, 2017, "except that he is able to carry out detailed, but uninvolved instructions to perform routine and repetitive tasks with no public interaction and no more than occasional interaction with coworkers or supervisors." (Tr. 22.) She found that he did not have any past relevant work experience. (Tr. 28.) Samuel N. testified that completed third grade, all his education was in special education, and he could not read or write in any language, so the ALJ found he had "a

2

marginal education." (Tr. 28, 51, 55.) Samuel N. was born in 1966, so his age category changed on August 13, 2021. (Tr. 28, 96.) The ALJ found that before that date, "there were jobs that existed in significant numbers in the national economy that [he] could have performed." (Tr. 28.) The Vocational Expert testified that Samuel N. "would have been able to perform the requirements of representative occupations such as: a laundry laborer . . . , a hand packager . . . , and a sandwich maker . . . ." (Tr. 29.) Based on the Vocational Expert's testimony, the ALJ concluded that Samuel N. was "not disabled" prior to August 13, 2021 because he "was capable of making a successful adjustment to other work . . . ." (*Id.*) However, after that date, Samuel N.'s "age category changed," meaning he was "disabled" because, in his new age category, there were no longer jobs that would exist in significant numbers in the national economy that he could perform. (*Id.*)

On appeal, Samuel N. argues the ALJ committed reversible error by: (1) substituting her lay judgment for the opinions of his medical providers; (2) failing to adopt and include or reject limitations of the mental health provider who she found persuasive; (3) failing to include all established limitations in the residual functional capacity; (4) failing to account for his conclusive moderate limitations in his ability to concentrate, persist, and maintain pace; (5) failing to adequately develop the record; and (6) failing to provide important information to the Vocational Expert that could have impacted her opinion. (*See* ECF 8 at 3.) He also argues the ALJ and the Appeals Council Judges lacked legal authority to adjudicate his claim because they were not properly appointed. (*Id.*)

## II.    LEGAL STANDARDS

The limited question before the Court is not whether Samuel N. was disabled. Rather, the Court must determine whether substantial evidence supports the Commissioner's finding that he was not disabled before his age category changed and whether the Commissioner, through the ALJ, correctly applied the relevant law. 42 U.S.C. § 405(g). An ALJ follows a five-step sequential-evaluation process to determine whether a claimant is disabled, sequentially considering whether: (1) the claimant is engaged in substantial gainful activity; (2) he or she has a severe impairment; (3) the claimant's impairment meets or equals a listed impairment[3]; (4) the claimant is able to do his or her past relevant work; and (5) he or she is able to do any other work, considering his or her age, education, work experience, and residual functional capacity ("RFC"). 20 C.F.R. § 404.1520(a)(4)(i)–(v). A claimant "bears the burden of proof at steps one through four" of the sequential-evaluation process. *Smith v. Comm'r of Soc. Sec.*, 631 F.3d 632, 634 (3d Cir. 2010). At step five, "the Commissioner bears the burden of establishing the existence of jobs in the national economy that an individual with the claimant's impairments is capable of performing." *Zirnsak v. Colvin*, 777 F.3d 607, 616 (3d Cir. 2014).

Relevant to Samuel N.'s claims here, the RFC is what he "'is still able to do despite the limitations caused by . . . h[is] impairment(s).'" *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 121 (3d Cir. 2000) (quoting *Hartranft v. Apfel*, 181 F.3d 358, 359 n.1 (3d Cir. 1999)); *see also* 20 C.F.R. § 404.1545(a)(1). To make an RFC assessment, the ALJ considers

---

[3] The listings of impairments are found at 20 C.F.R. pt. 404, subpt. P, app. 1.

all the claimant's medically determinable impairments, including any non-severe impairment. 20 C.F.R. § 404.1545(a)(2). The ALJ also considers "any statements about what [a claimant] can still do that have been provided by medical sources" and "descriptions and observations of [the claimant's] limitations from [their] impairments" provided by the claimant or "family, neighbors, friends, or other persons." *Id.* at § 404.1545(a)(2).

The Social Security Act requires an ALJ to state the "reason or reasons upon which [a denial of benefits] is based." 42 U.S.C. § 405(b)(1). An ALJ "may consider many factors" when determining the reason or reasons for their decision, "yet base a decision on just one or two" factors. *Zaborowski v. Comm'r of Soc. Sec.*, --- F. 4th ----, No. 23-2637, 2024 WL 4220691, at *1 (3d Cir. Sept. 18, 2024). "The statute requires administrative judges to explain only the dispositive reasons for their decisions, not everything else that they considered." *Id.* Said otherwise, ALJ's "must always explain the reasons for their decisions. But that does not mean always explaining all the factors." *Id.* An ALJ's opinion need only include "sufficient development of the record and explanation of findings to permit meaningful review." *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004) (citing *Burnett*, 220 F.3d at 120). The Court may read the ALJ's decision "as a whole" to determine whether the record was sufficiently developed. *Id.*

Following review of the entire record on appeal from a denial of benefits, the Court can enter "a judgment affirming, modifying, or reversing the decision of the Commissioner . . . , with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). Samuel N. bears the burden to explain how any "error to which he points could

have made any difference" in the ALJ's determination. *Shinseki v. Sanders*, 556 U.S. 396, 409, 413 (2009). Remand is not required if it would not affect the outcome of the case. *Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d Cir. 2005).

Any legal issues decided by the ALJ are subject to the Court's "plenary review." *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 200 (3d Cir. 2008). Courts review the Commissioner's factual findings for "substantial evidence" by looking at the existing administrative record. *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019). "[T]he threshold for such evidentiary sufficiency is not high . . . ." *Id.* at 103. Substantial evidence "means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). It "does not mean a large or considerable amount of evidence . . . ." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988).

Where substantial evidence supports the ALJ's findings of fact, the Court is bound by them, even if it "would have decided the factual inquiry differently." *Fargnoli v. Massanari*, 247 F.3d 34, 38 (3d Cir. 2001) (citation omitted). "The presence of evidence in the record that supports a contrary conclusion does not undermine the [ALJ's] decision so long as the record provides substantial support for that decision." *Malloy v. Comm'r Soc. Sec.*, 306 F. App'x 761, 764 (3d Cir. 2009). The Court may "not substitute [its] own judgment for that of the fact finder." *Zirnsak*, 777 F.3d at 611.

## III.  DISCUSSION

A review of the record demonstrates that substantial evidence supports the ALJ's determinations and remand is not required.

A.    **The ALJ and Appeals Council Judges Were Properly Appointed and Have Legal Authority to Adjudicate This Case.**

To begin, Samuel N.'s argument that the ALJ and Appeals Council judges were not properly appointed lacks merit. He contends that any actions then-Acting Commissioner Nancy Berryhill took after November 16, 2017 were unlawful under the Federal Vacancies Reform Act, 5 U.S.C. § 3346(a), which authorizes an Acting Commissioner of Social Security to serve for only 210 days. (ECF 8 at 24.) To support his argument, Samuel N. relies on a now-reversed District of Minnesota case, which held that an ALJ lacked authority to render a decision because Berryhill could not have been serving as the Acting Commissioner when she ratified the appointment of ALJs and Appeals Council judges. *Brian T.D. v. Kijakazi*, 580 F. Supp. 3d 615, 635-36 (D. Minn. 2022), rev'd and remanded *sub nom. Dahle v. Kijakazi*, 62 F.4th 424 (8th Cir. 2023), *cert. denied sub nom. Dahle v. O'Malley*, 144 S. Ct. 549, 217 L. Ed. 2d 293 (2024). (*See* ECF 8 at 24-25.) The Third Circuit addressed and explicitly rejected this position in *Gaiambrone v. Commissioner of Social Security*. No. 23-2988, 2024 WL 3518305 at *3 (3d Cir. July 24, 2024). It held that "Berryhill was lawfully serving as acting [Social Security] Commissioner when she ratified the appointments of the [Social Security Administration's] ALJs" because she "began serving as acting Commissioner a second time when President Trump submitted his first nomination for that position." (*Id.* at *3.). There is no reason to hold otherwise here.

B.     __The ALJ Properly Evaluated Medical Source Opinions.__

Samuel N. attacks the ALJ's consideration of medical source opinions on several fronts, arguing she "substituted her lay judgment for the opinion of every single medical provider." (ECF 8 at 3.) He contends that, after considering the medical providers' opinions with respect to his physical limitations, she should have found he was limited to either light or sedentary work on a less than full-time basis. (*Id.* at 4.) He also argues that the ALJ inappropriately rejected opinions that supported further restrictions. (*Id.*) Samuel N. also argues that the ALJ inappropriately disregarded the mental health findings of every mental health care provider in the record, including the state agency reviewing psychologists. (*Id.* at 6.) However, a review of the record shows that substantial evidence supports the ALJ's weighing of competing medical opinions and her determination that Samuel N. had the RFC to perform medium work.

"When weighing medical opinions," ALJs "must *consider* a range of factors, but all they must *explain* are the reasons for their decisions." *Zaborowski*, 2024 WL 4220691, at *1 (emphasis in original). Supportability and consistency are the "most important" persuasiveness factors, 20 C.F.R. § 404.1520c(b)(2), but they "are not dispositive" "if opposing medical opinions are equally well-supported and consistent . . . ." *Zaborowski*, 2024 WL 4220691, at *1. In that case, ALJs "must 'articulate how [they] considered the other most persuasive factors.'" *Id.* (quoting 20 C.F.R. § 404.1520c(b)(3)).

When considering supportability, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive

the medical opinions or prior administrative medical finding(s) will be." *Id.* at § 404.1520c(c)(1). When considering consistency, "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id.* at § 404.1520c(c)(2). In other words, "supportability relates to the extent to which a medical source has articulated support for the medical source's own opinion, while consistency relates to the relationship between a medical source's opinion and other evidence within the record." *Nolf v. Comm'r of Soc. Sec.*, No. 22-368, 2023 WL 8437872, at *1 (W.D. Pa. Dec. 4, 2023) (citation omitted).

To ensure an adequate, articulated rationale, an ALJ is required to provide a written explanation of "how [he or she] considered the supportability and consistency factors" with respect to a medical opinion. 20 C.F.R. §§ 404.1520c (b)(2), 416.920c(b)(2). However, an ALJ "need not reiterate the magic words "support" and "consistent" for each doctor." *Zaborowski*, 2024 WL 4220691, at *2.

1.    **The ALJ Properly Evaluated Medical Source Opinion Evidence Regarding Samuel N.'s Physical Impairments.**

Samuel N. contends the ALJ cherry picked record evidence about his back and knees "to justify her denial" of his benefits and inappropriately rejected the September 2019 treating source opinion of Barbara Layton, CRNP, FNP-C as unpersuasive. (*See* ECF 8 at 4-10; *see also* Tr. 27.) Layton, who was Samuel N.'s primary care nurse practitioner, opined that he would be limited to standing/walking for less than two hours, sitting for

about four hours, occasionally lifting and carrying up to 50 pounds, never lifting any weight on a frequent basis, and performing no more than occasional postural movements; and concluded he would likely be off-task 25 percent of the workday and absent from work about two days per month (Tr. 896-900.) Samuel N. argues that record evidence supports the limitations Layton assessed, citing a November 2018 emergency room visit where he was "explicitly forbidden from lifting anything heavy" upon discharge and told to restrict lifting to 10 pounds. (ECF 8 at 4 (citing Tr. 598, 655).) He contends that such a restriction "would have limited [him] to no more than light to sedentary work resulting in a finding of disability." (*Id.*) He maintains the opinion of the Agency's own consultative examiner Kathleen Mullin, M.D., supports Layton's opinion, arguing that Dr. Mullin noted limitations that equated with a restricted range of light work. (*Id.* at 5 (citing Tr. 66-68, 991-1001).) Samuel N. also contends the ALJ relied too heavily on a single examination that showed a negative straight leg test "in order to dismiss his allegations of severe pack pain . . . ." (*Id.* at 8.) He argues that the ALJ's analysis of radiological evidence "misrepresent[ed] the facts" of his lower back pathology and his bilateral knee pathology. (*Id.* at 9.)

An "ALJ is free to choose the medical opinion of one doctor over that of another" so long as the ALJ does not reject conflicting "evidence for no reason or for the wrong reason." *Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500, 505 (3d Cir. 2009) (citation omitted). And the ALJ was not required to "discuss in h[er] opinion every tidbit of evidence included in the record." *Hur v. Barnhart*, 94 F. App'x 130, 133 (3d Cir. 2004). Here, the ALJ explained that she "fully considered" prior "medical opinions and prior administrative medical

findings," which would have included Dr. Mullin's 2015 opinion. (*See* Tr. 26; 991-93.) Nevertheless, she was not obligated to adopt Dr. Mullin's opinion because it was rendered in connection with a prior benefits application. *See Mattei v. Comm'r Soc. Sec.*, No. 22-2721, 2023 WL 3479567, at *1 (3d Cir. May 16, 2023) (holding that "nothing in the [social security] regulations compels adoption or even consideration of a prior-found fact by an ALJ who decided a temporally distinct disability claim"). Even then, in 2015, Dr. Mullin opined that Samuel N. could lift and carry up to 100 pounds occasionally and 20 pounds frequently, suggesting Samuel N. was then-capable of medium work, a conclusion not inconsistent with the ALJ's RFC determination. (Tr. 22, 994) *See also* 20 C.F.R. § 416.967(c).

The ALJ adequately explained her reasons for finding that Layton's conclusions were "inconsistent with the medical evidence of record." (Tr. 27.) She cited diagnostic imaging showing only "mild multilevel degenerative disc disease of the lumbar spine and maintained vertebral body heights, alignment, and disc heights." (Tr. 27, 848.) In addition, Samuel N. had "not consult[ed] with a specialist such as a pain management physician or an orthopedist" and received only "routine and conservative treatment." (Tr. 27.) Layton prescribed Gabapentin and Mobic for pain. (Tr. 783.) She cited his negative straight leg raise testing from Samuel N.'s November 2018 emergency room visit but did not focus on that result alone. (Tr. 24.) She considered other findings from the visit, including that Samuel N.'s pain was "non-radiating," "[a]sprin had provided some relief," and his range of motion was only "slightly limited" due to pain. (Tr. 24 (citing Tr. 603, 650, 652.) Addressing the activity restrictions imposed after the November 2018

emergency room visit, the ALJ explained that the opinion that Samuel N. "must not lift over ten pounds" was "rendered in the immediate aftermath" of the emergency visit and was "not internally consistent with the mostly benign physical examination findings . . . ." (Tr. 27; *see also* Tr. 609, 643-44, 646-47, 652.) The ALJ also considered records from Samuel N.'s December 2018 emergency room visit for back pain where an examination showed a normal range of motion and "no clinical or examination findings for acute vertebral compression, aortic pathology, renal pathology, or spinal infection. (Tr. 24 (citing Tr. 1004-09.) The ALJ also observed that in 2019, a radiologist found x-rays of Samuel N.'s "knees showed no supra patellar joint effusion, fracture, or dislocation," with "minimal tricompartmental osteophyte formation in both" and "mild focal soft tissue swelling . . . ." (Tr. 19 (citing Tr. 847).) As a result, she found any knee issues did not rise to the level of a severe impairment. (Tr. 19.)

Although Samuel N. may disagree with the ALJ's assessment of Layton's opinion, she appropriately considered it given all the other record evidence regarding his back and knees. The ALJ explained why she found Layton's opinion was not persuasive, and she did not improperly substitute her lay judgment for Layton's. There is "such relevant evidence as a reasonable mind might accept as adequate to support" the ALJ's determination, and the Court may not re-weigh it to find otherwise. *Biestek*, 587 U.S. at 97; *see also Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 359 (3d Cir. 2011).

### 2. The ALJ Properly Evaluated Mental Health Care Providers' Opinions.

Samuel N. further argues that the ALJ inappropriately disregarded the findings of "every single mental health provider," including the state agency reviewing psychologists. (ECF 8 at 6.) He points to "evidence from various mental health providers and examiners" that he claims shows "severe mental health limitations." (*Id.*) The Commissioner responds that the evidence in question, including findings from Brook Crichlow, Psy.D., Shelly Ross, Ph.D., Brett Hartman, Psy.D., and Pirooz Sholevar, M.D., is not relevant to the period under consideration from September 2018 through August 2021 because it "relate[s] to prior applications." (ECF 12 at 24.)

Indeed, because Crichlow, Ross, Hartman, and Sholevar evaluated Samuel N.'s mental health limitations in 2015 and 2016, the ALJ was not required to specifically discuss the effect of their findings on her determination as they were not relevant to the application she was tasked with reviewing. *See Becker v. Colvin*, No. 14-1288, 2015 WL 1326346, at *2-3 (W.D. Pa. Mar. 25, 2015) (holding that ALJ did not err in failing to discuss medical opinions that were submitted in connection with a prior claim because the application under review was for a later time). Moreover, the ALJ did not disregard this evidence. Instead, she explained that she would "not defer or give any specific evidentiary weight, including controlling weight, to any prior administrative medical finding(s) or medical opinion(s)," even though she "fully considered the medical opinions and prior administrative findings in [Samuel N.'s] case." (Tr. 26.) Further, the ALJ's conclusion that Samuel N. was limited to carrying out detailed, but uninvolved,

13

instructions to perform routine and repetitive tasks was consistent with the earlier opinions. (Tr. 22). Remand is not required for further consideration of the mental health care providers' opinions.

### C.     The ALJ's RFC Determination Appropriately Accounted for Samuel N.'s Limitations.

Samuel N. argues that remand is required because the ALJ failed to adequately explain how her RFC determination accounts for his non-exertional limitations and limitations in his ability to concentrate, persist, or maintain pace. (ECF 8 at 14-20.) He argues that "to capture all [his] work restrictions, Agency policy is clear that adjudicators must construct their RFC findings on a function-by-function assessment based upon *all* of [his] impairments (both mental and physical/severe and non-severe)." (ECF 8 at 14 (citing 20 C.F. §§ 416.923, 416.945(a)(2) (emphasis in original)).) The Commissioner responds that the ALJ adequately considered Samuel N.'s non-severe impairments and included all limitations credibly established by the record. (ECF 12 at 23-31.) It has the better argument.

The ALJ's RFC determination need not "use particular language or adhere to a particular format." *Jones*, 364 F.3d at 505; see also *Lorie H. v. Comm'r of Soc. Sec.*, No. 20-13192, 2022 WL 2803168, at *6 (D.N.J. July 18, 2022) ("While a neat organization of the analysis around each function is preferable, failure by an ALJ to do so is not reversible error where the ALJ explains her RFC findings and those findings are supported by substantial evidence."). So long as substantial evidence exists to support an RFC determination, the Third Circuit has not required an ALJ to perform a "function-by-

function" analysis at step four. *See Chiaradio v. Comm'r of Soc. Sec.*, 425 F. App'x 158, 161 (3d Cir. 2011) (affirming an ALJ's RFC determination without "a task by task analysis," where the ALJ's "overall review carefully considered [the claimant's] past relevant work and . . . assessed what [the claimant] could reasonably do"); *Garrett v. Comm'r of Soc. Sec.*, 274 F. App'x 159, 164 (3d Cir. 2008) (affirming an ALJ's RFC determination without a function-by-function assessment where the ALJ questioned the claimant about her prior work's physical limitations and there was substantial evidence to support the ALJ's findings). "[T]he functional limitation findings do not dictate the terms of the ALJ's statement of the claimant's limitation in the final analytical steps. But those findings are relevant to that statement of the limitation, which must be sufficient to reflect all of a claimant's impairments." *Hess v. Comm'r Soc. Sec.*, 931 F.3d 198, 210 (3d Cir. 2019).

### 1.   The ALJ Adequately Addressed Samuel N.'s Non-Exertional Limitations.

Samuel N. argues that the ALJ's RFC assessment falls short because she "failed to include any non-exertional limitations." (ECF 8 at 15 (citing Tr. 22, 61-65).) He faults the ALJ for not including any pulmonary restrictions even though he "has repeated[ly] complained about his breathing abilities" and for failing to include other non-exertional limitations despite his repeated complaints about difficulty with his abilities to, *inter alia*, kneel, stoop, or crouch "[d]ue to his back and knees." (*Id.* (citing Tr. 58-59, 347-54, 399, 532, 642-654, 780-81, 909-12, 1006-09))

While the ALJ did not address Samuel N.'s pulmonary complaints in the section of her decision addressing step 4, she clearly discussed and considered the record

evidence regarding his "breathing disorder," noting at most, a "possible moderate restriction" as evidenced by a July 2019 pulmonary function test. (Tr. 19.) Despite his argument that the ALJ should have included pulmonary restrictions, Samuel N. displayed normal lung and respiratory findings across numerous examinations during the relevant period even though he was using cigarettes at the time. (Tr. 532, 604, 609, 642-43, 780, 782, 784, 786, 844-45.)

To support his argument that the ALJ should have specifically included limitations for kneeling, stooping, or crouching, Samuel N. only cites his own testimony. (ECF 8 at 15.) However, the ALJ explained that in determining his RFC, she "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence . . . ." (Tr. 22.) Her ALJ's RFC determination explicitly considered evidence relevant to Samuel N.'s complaints of back pain. (Tr. 23-29.) While she did not address his complaints of knee plain in the section of her decision addressing step 4, she discussed and considered the February 2019 knee x-rays which showed "mild focal soft tissue swelling" in some areas, but "no suprapatellar joint effusion, fracture, or dislocation," and "grossly maintained" femoral tibial joint spaces. (Tr. 19.)

The ALJ explained that she "carefully considered the non-severe impairments in assessing [Samuel N.'s] residual functional capacity . . . ." (Tr. 28.) Ultimately, "after careful consideration of the entire record," she found the medical evidence was "not consistent with the severity of symptoms that [Samuel N. had] alleged." (Tr. 22, 23.) Remand is not required for further consideration of Samuel N.'s non-exertional

limitations because the record contains "more than a mere scintilla" of evidence to support her decision to not afford them further consideration. *Biestek*, 587 U.S. at 97 (citation and internal quotation omitted).

### 2.      The ALJ Adequately Addressed Samuel N.'s Mental Limitations.

Samuel N. also contends that the ALJ's RFC assessment falls short because she "failed to include ANY work-related limitations to account for [his] moderate limitation in concentrating, persisting, or maintaining pace." (ECF 8 at 18) (emphasis in original). He argues the ALJ found that he had "moderate limitations in his ability to understand, remember and apply information; in the ability to interact with others; and in concentrating, persisting and maintaining pace, but "failed to provide any RFC limitation that would address [his] proven distractibility, absences, potential time off task, or difficulties performing at a consistent pace." (ECF 8 at 17-19 (citing Tr. 20-22).) He argues that *Ramirez v. Barnhart*, 372 F.3d 546 (3d Cir. 2004) requires remand because the ALJ did not adequately capture "the limitations in concentration, persistence, or maintaining pace that [she] found to be supported by the evidence of record." (ECF 8 at 20.) His argument is not persuasive.

"When there is evidence of a mental impairment that allegedly prevents a disability claimant from working, the Commissioner is required to evaluate the claimant's mental impairments by use of a [Psychiatric Review Technique ("PRT")]." *Rebecca L. v. Comm'r of Soc. Sec.*, 617 F. Supp. 3d 256, 268 (D.N.J. 2022); *see also* 20 C.F.R. § 404.1520a. "If a claimant's mental health impairments are not presumed to constitute a disability at step three, any mental impairments assessed in the PRT must be incorporated

into the RFC at step four because the RFC must include all 'credibly established limitations[.]'" *Kitchen v. O'Malley*, No. 23-484, 2024 WL 3510868, at *7 (D. Del. July 23, 2024) (quoting *Sudler v. Comm'r of Soc. Sec.*, 827 F. App'x 241, 245 (3d Cir. 2020)). However, a claimant's PRT results do not require the verbatim inclusion of specific language in the RFC, so long as those findings are "adequately conveyed." *Hess*, 931 F.3d at 209-10. "[T]he legal sufficiency of an ALJ's mental RFC assessment should not be addressed in the abstract, through a mechanical process which requires adherence to certain terms of art. Instead, this analysis should be a pragmatic consideration grounded in the evidence presented at the disability hearing." *Roecker v. O'Malley*, No. 24-47, 2024 WL 3362284, at *2 (M.D. Pa. July 10, 2024).

*Hess* clarified that "*Ramirez* did not hold that there is any categorical prohibition against using a simple tasks limitation after an ALJ has found that a claimant often faces difficulties in concentration, persistence, or pace. Rather, a simple tasks limitation is acceptable after such a finding, as long as the ALJ offers a valid explanation for it." 931 F.3d at 212 (internal quotation omitted). Whether an ALJ has provided a valid explanation for a mental RFC determination turns on the facts of each case. *Id.* at 211. To provide a valid explanation, an ALJ may highlight factors such as "mental status examinations and reports that revealed that [the claimant] could function effectively; opinion evidence showing that [the claimant] could do simple work; and [the claimant]'s activities of daily living . . . ." *Id.* at 214.

Here, the ALJ explicitly stated that she "considered [Samuel N.'s] moderate limitations in . . . concentrating, persisting, or maintaining pace" when she assessed his

RFC. (Tr. 28.)  She accounted for his moderate limitations by finding that Samuel N. could "carry out detailed but *uninvolved* instructions to perform routine and repetitive tasks with no public interaction and no more than occasional interaction with coworkers or supervisors." (Tr. 22 (emphasis added).) She also considered his "mild limitation in adapting or managing oneself but" found there were "no related functional limitations." (Tr. 28.)

To reach her RFC determination, the ALJ considered evidence including a January 2019 Function Report where Samuel N. stated that he "was very depressed and extremely anxious, . . . had trouble concentrating and would forget easily," and did not like to be around too many people as they made him nervous." (Tr. 23 (citing Tr. 347).) She considered record evidence that included his diagnoses of "major depressive disorder, recurrent, moderate" and "generalized anxiety disorder." (Tr. 23 (citing Tr. 759, 1087).) She reviewed his 2018 mental health treatment records and the results of a 2019 comprehensive biopsychosocial evaluation (Tr. 24-25.) She considered his July 2019 discharge from outpatient mental health services with a "good" prognosis and his subsequent return to therapy in October 2019. (Tr. 25.) She reviewed records which showed that he was "feeling more positive and less anxious and sad" while taking his medications in December 2019 and reports that he had an "anxious, irritated mood" in January 2020, but also had "goal-directed thought processes [ ] and a cooperative attitude." (*Id.*) Samuel N. had "unremarkable" mental status examinations in March, April, and May 2020 and "[h]is medications continued to be effective." (Tr. 26.) When insurance issues interrupted his medications until September 2020, he was "low, anxious,

and not sleeping much" but, by October 2020, he reported that "medication was helpful and effective" again. (*Id.*) The ALJ noted that the record regarding Samuel N.'s "daily activities "demonstrate[d] his functional independence." (*Id.*) Considering all of the evidence, she explained that Samuel N.'s statements about the intensity, persistence, and limiting effects of his symptoms were inconsistent with the severity of the symptoms that he had alleged. (*Id.*)

The ALJ was persuaded by the December 2018 PRT findings and mental residual functional capacity assessment from state agency psychological consultant Mark Hite, Ed.D. (Tr. 27.) Hite opined that Samuel N. was "moderately limited in understanding, remembering, or applying information and concentrating, persisting or maintaining pace" and that Samuel N. was able to "maintain attention and concentration for extended periods of time for simple routine tasks." (*Id.*) At step four, the ALJ found that Hite's opinion was "mostly consistent with the medical record, which contains largely unremarkable mental status examinations," although, in her view, Samuel N. had "greater limitations in interacting with others," noting documentation of "his anxious and agitated mood" and "fair eye contact." (*Id.*)

Hite's PRT sufficiently accounted for Samuel N.'s mental impairments and the ALJ adequately conveyed its findings when explaining her determination of his RFC. She considered all limitations credibly established by the record and her analysis is supported by "such relevant evidence as a reasonable mind might accept as adequate to support" her determination. *Biestek*, 587 U.S. at 103. Remand is not required because the ALJ

20

offered a valid explanation for her RFC determination after conducting a thorough review of Samuel N.'s mental impairments.

### D.   The ALJ Did not Breach Her Duty to Ensure the Record of Samuel N.'s Medical History was Fully Developed.

Samuel N. also argues remand is required because "the ALJ did nothing to develop the administrative record and relied exclusively upon h[er] own lay evaluation of the clinical findings of record" to reach her determination. (*See* ECF 8 at 21.) His argument is not persuasive. Because he was "in a better position to provide information about his . . . own medical condition," he bore the burden of developing the record regarding his disability. *Bowen v. Yuckert*, 482 U.S. 137, 146 n. 5 (1987); *see also* 20 C.F.R. §§ 404.1512(a) and 416.912(a). The ALJ's "only duty" was to ensure that Samuel N.'s complete medical history was "developed on the record before finding that [he] is not disabled." *Money v. Barnhart*, 91 F. App'x 210, 215 (3d Cir. 2004) (citing 20 C.F.R. §§ 404.1512(d), 416.912(d)). Samuel N. has not shown that the ALJ breached this duty.

When the state agency was developing Samuel N.'s claim, it "requested an independent medical consultative examination," but such an examination was "never scheduled by clmt/legal rep." (ECF 12 at 32 (citing Tr. 101-02).) Samuel N. now argues the ALJ and State Agency's development of the record "leaves a lot to be desired." (ECF 8 at 21.) He complains that he was denied benefits under 20 C.F.R. § 416.918,—"the regulation for failing to show up for a consultative examination"—even though he never received "a single notice for a consultative examination" from the State Agency. (*Id.*) Samuel N. waived a lack of notice argument when he failed to raise it in his post-hearing

letter to the ALJ. (Tr. 398.) Even if he did not, remand is not required just because he did not receive a consultative examination. An ALJ has discretion, and not a duty, to order one. *Thompson v. Halter*, 45 F. App'x 146, 149 (3d Cir. 2002); *see also* 20 C.F.R. § 416.919a (explaining that an ALJ "*may* purchase a consultative examination to resolve an inconsistency in the evidence, or when the evidence as a whole is insufficient") (emphasis added). Samuel N. has not shown the ALJ abused her discretion in declining to do so.

Samuel N. also faults the ALJ for her reliance on an examination by Gene Whang, M.D., a state agency medical consultant who trained as a gynecologist. (ECF 8 at 20-21.) However, "there is no requirement that a reviewing state agency medical consultant . . . specialize in the specific condition for which the claimant is seeking a disability." *Ramirez v. Kijakazi*, No. 22-431, 2023 WL 5916906, at *13 (M.D. Pa. Sept. 11, 2023). An ALJ may, but is not required to, discuss specialized medical training when evaluating whether a medical opinion is persuasive. *See* 20 C.F.R. § 404.1520c(b)(2); *see also* 20 C.F.R. § 404.1520c(c)(4) ("The medical opinion or prior administrative medical finding of a medical source who has received advanced education and training to become a specialist may be more persuasive about medical issues related to his or her area of specialty . . . ."). The ALJ did not err when she considered Dr. Whang's opinion or when she ultimately disagreed with his finding "that the record contained insufficient evidence to make a determination" regarding whether Samuel N. had a "severe physical medically determinable impairment."

Samuel N. has not shown that the ALJ failed to sufficiently develop his medical history before reaching her final determination.

### E.   Samuel N. Has not Shown that the ALJ Erred by Failing to Give Relevant Educational Information to the Vocational Expert.

Finally, Samuel N. argues remand is required because, in his view, the ALJ failed to give the vocational expert relevant information about his educational background. (ECF 8 at 21-24.) He argues that the ALJ classified his education as "marginal," when he should have been considered to be "illiterate."[4] (ECF 8 at 23.) Samuel N. contends that the agency's Vocational Expert was not aware that he "completed the third grade in special education and was unable to read or write in any language . . . ." (ECF 13 at 8 (citing Tr. 55, 57-58, 327, 352-53, 471, 965, 991, 1057-82, 1085-1130, 1144-1209).) He argues that the jobs the vocational expert identified required a level of reading that he was unable to do and that his inability "to read or write in any language whatsoever" was an

---

[4] When determining the appropriate education category, the Social Security Administration does "not consider whether an individual attained his or her education in another country or whether the individual lacks English language proficiency." SSR 20-01p, 2020 WL 1285114, at *3. The Social Security Administration eliminated the education category "inability to communicate in English" in 2020, explaining that it "is no longer a useful indicator of an individual's educational attainment or of the vocational impact of an individual's education because of changes in the national workforce . . . ." Removing Inability to Communicate in English as an Education Category, 85 FR 10586-01, 2020 WL 885690, at *10586 (Feb. 25, 2020).

"Illiteracy" means an inability to read or write in any language. *See* 20 C.F.R. § 416.964(b)(1); *see also* SSR 20-01p, 2020 WL 1285114, at *2. Social Security Ruling SSR 20-01p explains that "[g]enerally, an illiterate person has had little or no formal schooling," while a claimant "who completed fourth grade or more is able to read and write a simple message" and generally will not be categorized as "illiterate." 2020 WL 1285114, at *3. "While illiteracy may significantly limit an individual's vocational scope, the primary work functions in most unskilled occupations relate to working with things (rather than data or people). In these work functions, education has the least significance." Section 202.00(g), Appendix 2 to Subpart P, 20 C.F.R. Part 404.

important non-exertional limitation which could have completely changed" her testimony. (*Id.*; ECF 8 at 23-24.) His arguments notwithstanding, a review of the record shows that the Vocational Expert's testimony was not marred by missing information and does not require remand.

Any inquiry concerning the reliability of a vocational expert's testimony must be handled "case-by-case," taking "into account all features of the . . . testimony, as well as the rest of the administrative record." *Biestek*, 587 U.S. at 108. In October 2019, the ALJ asked De Leon-Curet to provide her testimony assuming "a hypothetical individual of the same age *and education* as" Samuel N. (Tr. 64 (emphasis added).) Before her testimony, De Leon-Curet had access to copies of exhibits including an October 11, 2018 "Disability Report—Adult" prepared by Samuel N.'s attorney which indicated that Samuel N. did not speak and understand English, could not read and understand English, could not write more than his name in English, had a "Learning Disability, illiterate," had completed fourth grade (on a date he could not remember), did not attend special education classes, and had not completed any specialized job training, trade or vocational school. (Tr. 314-19; *see* Tr. 160 (letter to Vocational Expert Services, Inc. requesting expert testimony in Samuel N.'s case and making copies of pertinent exhibits available).) De Leon-Curet did not ask for any further information about Samuel N.'s education and, during the hearing where she testified, Samuel N.'s attorney did not object that the Vocational Examiner lacked relevant information. (*See* Tr. 61-69.) In addition, Samuel N.'s post-hearing brief, which raised numerous issues, did not complain that the vocational expert should have been given more information about his education. (Tr. 394-97.)

Samuel N. has not established that his "educational background was never presented to" the vocational expert such that her testimony was unreliable. (ECF 8 at 23.)

Moreover, regardless of whether Samuel N. had a marginal education or was illiterate, remand is not required because he has not shown that the outcome would have been different—*i.e.,* that he would have been found to be disabled before his 55th birthday—either way. "To determine what type of work (if any) a particular claimant is capable of performing, the Commissioner uses a variety of sources of information, including the [Dictionary of Occupational Titles], the [Social Security Administration's] own regulatory policies and definitions (found in the Code of Federal Regulations ("CFR")), and testimony from [Vocational Experts]." *Zirnsak*, 777 F.3d at 616. "As a general rule, occupational evidence provided by a [Vocational Expert] should be consistent with the occupational evidence presented in the [Dictionary of Occupational Titles]." *Id.* at 617. The Third "Circuit has emphasized that the presence of inconsistencies does not *mandate* remand, so long as 'substantial evidence exists in other portions of the record that can form an appropriate basis to support the result.'" *Id.* (emphasis in original) (quoting *Rutherford*, 399 F.3d at 557).

There is no question that the ALJ recognized that Samuel N. testified that he "is unable to read or write in any language" before making her determination. (Tr. 23) In addition, she asked the Vocational Expert if there would be unskilled occupations available for "a hypothetical individual of the same age *and education* as" Samuel N. with "no past work," who "can perform medium exertional work and is able to carry out detailed but uninvolved instructions to perform routine and repetitive tasks with no

public interaction." (Tr. 64-65 (emphasis added).) De Leon-Curet testified that there would be work available as a laundry laborer, hand packager, and sandwich maker and agreed that her testimony was "consistent with the Dictionary of Occupational Titles." (Tr. 65.) De Leon-Curet also testified that those same jobs would exist for an individual who was "more limited in that they can have no more than occasional interaction with coworkers or supervisors." (Tr. 65-66.)

Because the Vocational Expert was asked to consider Samuel N.'s education when deciding what work he could do," "[a] fair inference can be drawn from the hearing testimony that the [Vocational Expert] took [his] English language ability [(or lack thereof)] into account" when she identified existing jobs in the national economy. *Kurbanova v. Berryhill*, No. 16-1054, 2017 WL 621216, at *11 (M.D. Pa. Feb. 15, 2017). Importantly, Samuel N.'s attorney posed questions to the Vocational Examiner but did not ask if any language-related challenges would alter her conclusions about whether there would be unskilled occupations available for a hypothetical claimant like Samuel N. (Tr. 66-68.) *Cf. Zirnsak*, 777 F.3d at 619 (finding that any conflict between the Vocational Expert's testimony and the Dictionary of Occupational Titles was "not so obvious that the ALJ should have pursued the question" where, *inter alia*, the plaintiff's "counsel did not question the [Vocational Examiner] regarding inconsistencies at all") (internal quotation and citation omitted).

Samuel N. maintains that the ALJ erred because the jobs that De Leon-Curet identified require a certain level of reading. (ECF 8 at 23-24.) However, it is not obvious that reading or writing "are essential, integral, or expected" for those positions. *Gutierrez*

*v. Colvin*, 844 F.3d 804, 808 (9th Cir. 2016); *see also Ruiz v. Berryhill*, 732 F. App'x 592, 594 (9th Cir. 2018) (holding remand was not required where the record suggested that the claimant did not have the English language capabilities identified for a position in the Dictionary of Occupational Titles because it was "not obvious that the language requirements are essential, integral, or expected for the work"). Samuel N. "does not seriously argue that [he] is incapable of performing the jobs" that De Leon-Curet recommended. *Zirnsak*, 777 F.3d at 618. Instead, he only speculates that, *if* the Vocational Expert was not aware that was unable to read or write in English, she relied on "incorrect information that . . . *could have* completely changed the outcome of her testimony." (ECF 13 at 8 (emphasis added).) Despite his contention, the record supports the conclusion that Samuel N. had sufficient language skills to perform the identified positions. Even though they are classified as GED language level 1 jobs, "[a] decision holding that illiterate individuals could not perform Level 1 jobs would mean that illiteracy [is] a per se disability under the" Dictionary of Occupational Titles, and it is not. *Lawson v. Apfel*, 46 F. Supp. 2d 941, 945, 947 (W.D. Mo. 1998); *see also Pinto v. Massanari*, 249 F.3d 840, 847 (9th Cir. 2001) ("A claimant is not per se disabled if he or she is illiterate.").

Moreover, the jobs that De Leon-Curet identified were "just a representative sampling of jobs available . . . ." (Tr. 65.) Although the Vocational Examiner gave her testimony based on an assumption that Samuel N. had no past work (Tr. 65), the record suggests Samuel N. had previously held other jobs where reading and writing are not obviously essential or expected, including "as a cabinet maker and a paper bundler," at

"various construction and labor jobs," and "gathering the cows, bringing them to the grass, and feeding them." (Tr. 23.)

Consideration of the entire record compels the conclusion that substantial evidence exists to support the ALJ's conclusion that Samuel N. could perform the positions identified and that he was not harmed by any failure to specifically inform the Vocational Expert that he was illiterate. *See Serrano v. Kijakazi*, No. 23-408, 2024 WL 2158681, at *17 (M.D. Pa. May 14, 2024) (holding that "although the ALJ could have reached a different conclusion on the issue of literacy . . . any error on this score would have been harmless, since literacy was not required for any of the positions available to the plaintiff"). Remand for reconsideration of this issue is not required.

## IV.   CONCLUSION

Upon review, the ALJ's decision and the underlying record show that her evaluation of Samuel N. is supported by "such relevant evidence as a reasonable mind might accept as adequate to support" her determination. *Biestek*, 587 U.S. at 103. Keeping in mind that the threshold for "evidentiary sufficiency is not high," remand for further consideration is not required based on Samuel N.'s arguments. *Id.*

An appropriate Order follows.